## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

---

| | |
|---|---|
| Dearborn Life Insurance Company d/b/a Blue Cross Blue Shield of Texas, | Case No. 4:25-CV-02055 |
| Plaintiff | |
| vs. | |
| Balkees Abderrahman, Alexandra K.L. Noel, and Helen M.Y. Turner, | |
| Defendants | |

---

### ALEXANDRA K.L. NOEL AND HELEN M.Y. TURNER'S ANSWER TO BALKEES ABDERRAHMAN'S FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST BALKEES ADBERRAHMAN

---

**COME NOW**, Alexandra K.L. Noel ("Noel") and Helen M.Y. Turner ("Turner"), with this Answer and Counterclaims and respectfully show the Court the following:

### NOEL AND TURNER'S ANSWER TO BALKEES ABDERRAHMAN'S ("ABDERRAHMAN") FIRST AMENDED COMPLAINT

*"Never let the truth get in the way of a good story."* -Mark Twain

One phone call to Dearborn Life Insurance Company's ("Dearborn") counsel would have saved Abderrahman a lot of time in bringing this meritless complaint. Counsel for Noel and Turner made that phone call on July 2, 2025, and learned the following. Dearborn had the lawsuit drafted before Noel's and Turner's phone interviews with Dearborn. The substance of Noel's and Turner's phone conversations with Dearborn was not a but for cause of Dearborn filing its Complaint in Interpleader. If Abderrahman,

Noel, and Turner all completed Dearborn claims forms, as they did here, then Dearborn was going to file the interpleader lawsuit regardless of the phone interviews with Noel and Turner.  The phone interviews summarized in DEARBORN 175-177 happened on September 10-11, 2025.  Dearborn filed this lawsuit on September 12, 2025.  But why let the truth get in the way of a good story?

By filing this pleading, Noel and Turner do not intend to supersede or replace Doc. Nos. 8-9 filed in USDC Case No. 24-cv-01085 for the Western District of Texas.

Noel and Turner generally deny the averments in Abderrahman's First Amended Complaint unless specifically admitted herein.

1.    Noel and Turner admit the averments in Paragraphs 1-4.

2.    Noel and Turner admit the averments in the first sentence of Paragraph 5. Noel and Turner deny the remaining averments of Paragraph 5.

3.    Noel and Turner admit the averments in the first sentence of Paragraph 6. Noel and Turner lack sufficient knowledge to admit or deny the averments in sentences two and three of Paragraph 6.  As to the remaining averments in Paragraph 6, Noel and Turner state that Dr. Jordan's autobiography speaks for itself.

4.    Noel and Turner lack sufficient knowledge to admit or deny the averments in Paragraphs 7-10.

5.    Noel and Turner lack sufficient knowledge to admit or deny the averments in the first three sentences of Paragraph 11.  Noel and Turner deny the remaining averments in Paragraph 11.  Noel and Turner add that, at the time, neither of them had an

issue with Dr. Jordan applying for the Accelerated Death Benefit ("ADB").  Noel and

Turner were then unaware that Dr. Jordan had over $2,500,000 available to him through

at least three retirement accounts.  But a legal issue arose when Abderrahman took the

$424,000 check payable to "Virgil Jordan" and used it for her own benefit via their joint

account.  *Dr. Jordan* never got any benefit from *his* ADB because his unendorsed check

was deposited into an ATM after he died—by *Abderrahman*.



6.      Noel and Turner deny the averments in Paragraph 12.  Noel and Turner add

that Dr. Jordan's "faith and trust in Dr. Abderrahman" was explicitly questioned by Dr.

Jordan in text communications to neighbor Blake Hillegeist "Hillegeist."  Dr. Jordan

asked Hillegeist to keep some messages "confidential" so as not to tip Abderrahman, and

therefore himself, further off the edge.

7.      Noel and Turner deny the averments in the first sentence of Paragraph 13.

Noel and Turner lack sufficient knowledge to admit or deny the remaining averments in

Paragraph 13.  Noel and Turner add that Dr. Jordan clearly referred to Abderrahman as

"family," and likely his "granddaughter." These descriptors, however, should not keep appearing in pleadings to justify the false relationship listed on the death certificate. Abderrahman ordered 13 expedited copies of that death certificate.

8.     Noel and Turner deny the averments in Paragraphs 14-15. Noel and Turner had a close relationship with their father. His autobiography is dedicated to them and his mother, Sybil Cynthia Mottram.[1] Noel further states that the first time she became suspicious of Abderrahman occurred when Abderrahman made moves that Noel perceived as being geared toward excluding Noel and Turner from speaking at the memorial service. Then, 47 days after the July 25, 2024 memorial service, Noel received this LinkedIn message from Dearborn attorney Rebecca Bryant:

---

[1] Dr. Jordan's mother's name is incorrectly listed as "Cynthia Mottram" on the Death Certificate.

SEP 10, 2024

 Rebecca Bryant ✓ · 10:15 am

**Questions regarding Dr. Virgil Jordan's life insurance**

Ms. Noel:

I am a member of the special investigations unit at Dearborn Group (doing business as Blue Cross and Blue Shield of Texas). My condolences for the recent loss of your father. I am messaging you here because I have been attempting to contact you to clarify some near death changes made on your father's private life insurance policy held with us. I haven't been able to find a telephone number or email address for you. Would you mind calling or emailing me so that we can discuss. My email address is rebecca_bryant@mydearborngroup.com and my direct line is 630-458-7294.

Thanks much,
Rebecca

In a subsequent phone call with Bryant, Noel learned that Abderrahman lied to Dearborn/Blue Cross Blue Shield. Noel also learned that Abderrahman declined to provide Noel's and Turner's contact information to Dearborn/Blue Cross Blue Shield so it could interview Noel and Turner. Two days before Bryant messaged Noel, Abderrahman made this incriminating statement to Dearborn/Blue Cross Blue Shield: "And [Dr. Jordan] can update his designation anytime pre-mortem. *Nothing unlawful and/or suspicious here.*"

9.     Noel and Turner deny the averments in the first sentence of Paragraph 16. As to the remaining averments in Paragraph 16, Noel and Turner admit telling Dearborn

5

that Dr. Jordan was very confused and medicated, but deny telling Dearborn that Dr. Jordan was sedated.  Noel may have told Dearborn that Dr. Jordan had "consciousness loss third week of May."  Noel admits that, if that statement was made, it was incorrect. Abderrahman sent a text message to Noel and Turner on June 3, indicating Dr. Jordan's phone was broken. On June 4, Abderrahman indicated he had "entered the final stages according to the hospice team and my friend the medium."  On June 5, Abderrahman indicated Noel and Turner's arrival to see her father on June 9, "might be too late."  Noel arrived to see her father on June 7.  Her father was unconscious upon her arrival.

10.     Noel and Turner deny the averments in the first sentence of Paragraph 17. Noel and Turner admit the averments in sentences two and three of Paragraph 17.  Noel and Turner deny the averments in the fourth sentence of Paragraph 17.  As to the remaining averments in Paragraph 17, Noel and Turner state the messages and photograph speak for themselves and deny Abderrahman's subjective characterization of the same.  Noel and Turner further state that Abderrahman texted the housekeeper on March 10, 2024, and stated, in part, "Dr. Jordan has been getting sicker and weaker.  He can't leave his bedroom for more than 1 hour.  So we have to find a cleaning crew that cleans the house very quickly . . . ."  The housekeeper, Marta Santizo, will testify that she observed unopened mail addressed to Dr. Jordan that was discarded by Abderrahman. Santizo will testify some of this mail appeared to be greeting cards from family and/or friends.  These moves by Abderrahman are consistent with her desire to isolate Dr. Jordan and to make him believe that people were abandoning him.

11.    Noel and Turner deny the averments in Paragraphs 18-19 and state that the referenced medical records speak for themselves.

12.    Noel and Turner clarify the averments in Paragraphs 20-21 as follows. Noel and Turner deny any averments in Paragraphs 20-21 that conflict with their clarifications and deny any and all other averments in Paragraphs 20-21.  First, it should be noted that information at issue came via email and those emails were produced as NOEL-TURNER 00003-00019.  Further, at 10:07 am on Monday April 29, 2024, Noel texted Abderrahman to tell her that Noel was applying for FMLA so she could take time off work as needed to visit her father.  Noel also told Abderrahman she planned to see her father that weekend (5 days later).  Noel asked Abderrahman for contact information for her father's doctor so the doctor could complete forms to help Noel with the FMLA process.  Not coincidentally, at around 5:00 pm on April 29, 2024, Candace Ganjavi, without warning, found herself "witnessing" signatures on three consequential documents.  By April 29, 2024, Dr. Jordan was on hospice, bedbound, isolated, and dependent on Abderrahman for his daily needs.

After getting the doctor's contact information from Abderrahman on April 29, 2024, Noel sent her FMLA form to her father's doctor for signature.  On May 9, 2024, Noel was inadvertently emailed an Accelerated Death Benefit form by MD Anderson staff.  Noel knew that accelerated death benefits were used to assist with expenses for terminally ill people.  Noel had no concerns at that point for a couple reasons:  (1) she still trusted Abderrahman; and (2) she assumed her father had some medical expenses he

needed assistance with.  Noel was unaware that her father had millions sitting in retirement accounts.  As shown in NOEL-TURNER 00003-00019, Noel did not receive any forms or indications regarding beneficiary changes.

On September 11, 2024, Turner stated in an interview with Bryant that Noel had "personal knowledge" of a beneficiary change.  The first time Noel was informed of a beneficiary change came via a phone call with Bryant on September 10, 2024.  Noel relayed this information to Turner on September 10, 2024.

13.     Noel and Turner deny the averments in Paragraphs 22-24.

14.     Noel and Turner lack sufficient knowledge to admit or deny the averments in Paragraph 25.

15.     Noel and Turner deny the averments in Paragraph 26.

16.     Noel and Turner admit that venue is proper and the remaining averments in Paragraph 27 do not require a response.

17.     Noel and Turner deny the averments in Paragraphs 28-34 and deny that Abderrahman is entitled to any of the relief sought.  Noel and Turner deny that Abderrahman is entitled to the declaratory relief sought.

18.     Noel and Turner deny the averments in Abderrahman's Prayer for Relief and deny that Abderrahman is entitled to any of the relief sought.

19.     Noel and Turner seek costs, disbursements, and any other relief this Court deems just and equitable in connection with their defense against Abderrahman's First Amended Complaint.

**Affirmative Defenses**

20.     Noel and Turner affirmatively allege that Abderrahman's First Amended Complaint fails to state a claim upon which relief may be granted.

21.     Noel and Turner affirmatively allege that Abderrahman's First Amended Complaint is barred by estoppel.

22.     Noel and Turner affirmatively allege that Abderrahman's First Amended Complaint is barred by unclean hands.

23.     Noel and Turner affirmatively allege that Abderrahman's First Amended Complaint is barred because her own actions and omissions, not Noel's and Turner's interviews, caused Dearborn to file the interpleader lawsuit.  Those actions included Abderrahman's cageyness with, and threats of litigation against, Dearborn/BCBS.

**NOEL AND TURNER'S COUNTERCLAIMS AGAINST ABDERRAHMAN**

24.     Noel and Turner restate all of the averments in the preceding paragraphs as if fully stated herein.

25.     Dearborn is no longer a party to this action.  Noel and Turner are opposing parties to Abderrahman and vice versa.

26.     This Court has personal jurisdiction over this action because Abderrahman is a resident of Texas.

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the

amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Abderrahman is a citizen of Texas. Noel is a citizen of Minnesota. Turner is a citizen of Utah.

28.     Venue is proper under 28 U.S.C. § 1391(b) because Abderrahman resides in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

### Background

29.     Dr. Jordan was Noel and Turner's natural father.

30.     Noel and Turner are Dr. Jordan's only natural children.

31.     Dr. Jordan had no adopted children.

32.     Dr. Jordan was not married and had no spouse at the time of his death.

33.     Abderrahman was not related to Dr. Jordan by blood or marriage.

34.     Dr. Jordan died on June 9, 2024.

35.     Dr. Jordan made some decisions of his own free agency to provide for Abderrahman after his death. For example, on July 31, 2021, Dr. Jordan texted Hillegeist:

> Let me write as I have no international service
> Confidential
> 1 I need Balkees to be safe . All good for my treatment now but things change
> I am advised by my financial tax person I should not pay of my mortgage as I need the tax relief Can I add Balkees to co ownership so there is no house dispute ?
> 2 I must alter my will when I return as I do NOT want Shanks to sell off my assets on the walls I require it to All be left as it is and go to Balkees ( ps my children are successful and are provided for with my retirement millions )
> I will contact the lawyers you recommended when I return from NY . This is if the plane goes down !
> Craig ( aka Dic )
>
> Doc

36.    Abderrahman avers that she moved into Dr. Jordan's house in 2022.  On February 9, 2022, Dr. Jordan made another decision of his own free agency to benefit Abderrahman after his death by adding her to the deed on his house.  Dr. Jordan had been 2817 Newman Street's sole owner since December 5, 2014.

37.    Shortly after moving into the house, Abderrahman asked neighbor Blake Hillegeist to contribute money for her startup:

11

To: **Balkees Abderrahman**

May 28, 2022 at 10:20 AM

Good morning Blake, hoping you are having a nice time in Austin with Rosie!

We did not get the chance to discuss if you wish to provide some philanthropic support for my startup's lawyer fees. I'm against a deadline to pay 7k in the next 10 days, and I reached out to you and two other contacts if they wish to help with that.

Dr Jordan and I have put a lot of money to cover the prototype development and we are maxed out! :(

I have world class ppl on the board of my startup like David Eagleman, and it has been assessed by top business professionals to be a high-potential startup.

Your support can help keep the dream alive, but I am fully understanding if you don't wish to participate, and I will always love and respect you the same xo

38.     Apparently, Dr. Jordan had already made significant contributions to Abderrahman's startup, OSexiFi, Inc.  The startup centered on a "personal stimulation device for holistic health and sexual pleasure."

39.     In October 2022, Dr. Jordan texted Hillegeist:

Blake confidential
You were right about my will and reversals now it is done
"It is as it is "and I must do as much as I can to help Balkees despite her not reciprocating my feelings to keep her safe after I am gone . Her excellence
Deserves my support but her position is that I must try harder to cure my fatal cancer type
Doc

40.    This message indicates that, in or around October 2022, Dr. Jordan made changes to his estate plan to Abderrahman's benefit.  Abderrahman portrayed herself as a humble and generous caregiver to Dr. Jordan.  Her narrative still includes this fabricated tale of woe, "From 2022 through 2024, [Abderrahman] slept on the floor in a separate room in Dr. Jordan's home on a three-inch foam topper pallet . . . ."  Not so.  On March 12, 2023, Abderrahman texted Hillegeist that she had been sleeping on the couch but a king bed (to upgrade from the queen) was on the way so she and Dr. Jordan could comfortably share a bed.

<u>**Evidence of the Existing Schism Surfaces**</u>

41.    In April 2023, Dr. Jordan and Abderrahman had a fight that included Abderrahman throwing an object at him.  The object broke some window blinds.  On April 19, 2023, Abderrahman reached out to Hillegeist for help fixing the blinds stating, "My bad."

42.    On June 13, 2023, Dr. Jordan sent Hillegeist a text message and then there was a gap in the text communications between the two of them until October 7, 2023. That exchange begins as follows:



43.     The same day Dr. Jordan responded to Hillegeist that things were not better—the subject was clearly the relationship between Dr. Jordan and Abderrahman. Dr. Jordan's October 7, 2023 response to Hillegeist is below.  A couple months later, Dr. Jordan made more changes to his estate plan inuring to Abderrahman's benefit.

44.     By the middle of 2023, Abderrahman had largely seized control of Dr. Jordan's affairs and was exercising significant control over his everyday life.  Dr. Jordan was getting progressively sicker, and Abderrahman had the motive and opportunity to take advantage of him for her own benefit.

45.     In July 2023, Abderrahman sought help from Hillegeist on tax and/or ownership issues regarding Dr. Jordan's home and she told Hillegeist, "[Dr. Jordan] doesn't check his mail and I have to do that."

46.     In August 2023, Abderrahman was again seeking Hillegeist's help on tax issues for herself and Dr. Jordan.  She asked Hillegeist to send relevant information to her email address rather than Dr. Jordan's because Dr. Jordan's employer "can access others' emails if they want to."

47.     Abderrahman, Blake, and Dr. Jordan had this text exchange beginning at 5:37 am on October 24, 2023:



Oct 24, 2023 at 5:37 AM

Good morning Lana and Blake,

Dr Jordan and I had a big fight.

He has become very difficult with me, to the point that I can't engage with him any further, until I decide what to do.

But, he has 2 physical therapy appointments every week that he must attend: Tuesday 8-9 AM and Thursday 10-11 AM, TIRR Memorial Hermann 2455 S Brasewood. Lana, if you kindly could help with these. He already skipped the last session and they weren't happy. If you can't, then Craig needs to figure out how to go there on his own and manage all of his things.

Thank you, and apologies for any inconvenience.

Craig Jordan

Dear Blake and Lana
Balkees has chosen another path for her future and I do not fit into that . Naturally I am heartbroken but I cannot see any ways forward as she has decided a new path for her future I cannot blame her but I can do nothing to help her at present .
I need new therapy to treat my disease but no success by MDA as yet , so this has come as a blow to me in planning ahead
Naturally, I support her decision but regret he ABSURRAHMAN000650
I ask only for your help allowing me to honor appointments

as best as you can
With regrets
Doc

Blake Hillegeist

Ok Doc, get ready for your appointment. I'll have an Uber pick you up at 7:30 AM then I'll come pick you up at 9 AM today.

Craig Jordan

Thank you Blake

I deeply regret it has come to this but I understand her difficulties with me now as a patient , I must move forward and she now chooses her own path .

48.    The fracture deepened the following week.  On November 4, 2023, Dr.

Jordan texted Hillegeist and then the two had the following exchange:

Nov 4, 2023 at 2:03 PM

Noel-Turner_0t

At your convenience I need to have a heart to heart
Balkees has completely melted down after going through my
phone and finding out about my treatments from my doctors
she does not want me to take
This would be my suicide
So has terminated our relationship forthwith
I am lost and don't know what to do for the future
Confidential

> Hi doc. I'm sorry that you are having to deal with the behavior
> when you're fighting for your life. I have appointments until
> around 7. I'll let you know when I get back home. If you need
> me before the let me know.

> me before the let me know.

Thanks
She is completely irrational
She demands to control everything, so she for example , has
the first class BA airline tickets to London for my prize
presentation that now I will voluntarily miss
I will have to inform my doctors about her dangerous actions

I will have to inform my doctors about her dangerous actions
to endanger my official treatment
She intends to terminate all contact so I must rely on your
generosity to get me places , for reimbursement, via Uber
All rather VERY sad but no Team here only her disagreeing
with my doctors treatment plan . I must do my treatment her
way or she does not participate
See you when convenient this evening
Heart breaking

> Im team Jordan 😑

Appreciated
What a mess and not rational

49.    Hillegeist testified that Dr. Jordan confided in him that Abderrahman

disapproved of certain prescribed mediation Dr. Jordan was taking for his cancer

treatment.  Dr. Jordan told Hillegeist he hid those medications at his MD Anderson

office.  Abderrahman's course of dealing with Dr. Jordan raises concerns regarding

potential elder abuse, which can include physical/emotional abuse, financial exploitation, or neglect.

### Appeasing Messages are Delivered Two Days After the Blowup

50.    Abderrahman will aver that the wounds healed just two days later as shown by the text messages below.  A reasonable factfinder could conclude otherwise, particularly given that Dr. Jordan made changes to his estate plan further inuring to Abderrahman's benefit less than one month later.



51.    The next round of changes to Dr. Jordan's estate plan were made in early December 2023, while he was hospitalized.  Dr. Jordan was admitted to the hospital because, according to Abderrahman, he was "terribly sick."  He remained inpatient from November 28-December 8, 2023.

52.     Dr. Jordan and Abderrahman planned to travel to the United Kingdom from November 27-December 12, 2023.  Part of that trip included Dr. Jordan receiving an award and Abderrahman visiting her psychic.

53.     Abderrahman texted neighbors Hillegeist and Lana Sullivan that, in her view, Dr. Jordan's outlook improved while he was inpatient:



54.     Dr. Jordan's new estate plan with more benefits inuring to Abderrahman was only days away from completion when Abderrahman reported the improvement in Dr. Jordan's outlook.

55.     The facts recited above and the communications below surrounding the December 2023 changes to Dr. Jordan's estate plan raise significant concerns as to Abderrahman's level of influence up to that time.

56. On December 1, 2023, Abderrahman wrote to Hillegeist:



57. On December 2, 2023, this exchange occurred between Dr. Jordan,

Abderrahman, and Hillegeist:



58. Abderrahman was playing the lead role in Dr. Jordan's estate planning as he

remained inpatient.

59. On December 3, 2023, Dr. Jordan texted Hillegeist:

To: V. Craig Jordan

Dec 3, 2023 at 5:30PM

**Dear Blake**
**Thanks for spending the time executing the processing of**
**my will**
**Much appreciated**
**Doc**



Noel-Turner_000276

60.    On December 8, 2023, Dr. Jordan was discharged from the hospital and returned home.

61.    Shortly thereafter a dustup of some kind occurred relating to the housekeeper, Marta Santizo, regarding payment for her services.

62.    On December 21, 2023, Abderrahman texted Santizo:

Dec 21, 2023 at 6:48 AM

Dr Jordan talked to Blake this morning and he is on your side. You can talk to him, he is still here in Houston, and will leave on Monday. You can do this 🙏

I convinced Dr Jordan, woho. He will give you your job back when you talk to Blake and Lana 🙏

Good news ✨ Merry Xmas

## **The Leadup to the Ultimate Issue**

63.    By early 2024, Dr. Jordan's health was steeply declining.

64.    On March 10, 2024, Santizo was let go via this (partial) text message from Abderrahman:

21



65.    On April 17, 2024, Abderrahman texted Dr. Jordan's cousin, Kathy

Scruggs:



66.    On April 25, 2024, Abderrahman texted Scruggs to report Dr. Jordan was

under financial pressure:

Thu, Apr 25 at 7:57 PM

Kathy Scruggs

**KS** We went to Geo Lewis before leaving Houston. Learned more about the arrangement opportunities, and how we can hold down the cost.

It was great seeing you and Chris!

That's great to hear Kathy. Because Craig is going through some financially-difficult times with being let from the MD Anderson, and having to pay for all of his taxes and the medical expenses -many of which are not fully covered by the insurance.

That's why one idea was for his daughters to cover that and take it off his plate. A way to honor their father at his funeral.

*referring to any food arrangements

67.    Abderrahman's April 2024 portrayal of Dr Jordan's finances is suspicious because this terminally ill 76-year-old man with no dependents had over $2,500,000 available to him through at least three retirement accounts.

68.    Abderrahman's April 2024 portrayal of Dr. Jordan's finances is also suspicious because Dr. Jordan spent almost $15,000 on mobile IV services rendered by Candace Ganjavi to himself and Abderrahman between January 2024 and his death. These services were not covered by insurance.

69.    Abderrahman's messages to Scruggs in April 2024 also indicate she had access to, and knowledge of, Dr. Jordan's finances, stating "He has spent over $100,000 over the past few months [on medications and treatment]."

70.    Records produced by Abderrahman indicate that in-home hospice services for Dr. Jordan started on April 27, 2024.

71.    Hospice is a specialized form of end-of-life care for the terminally ill.

72.     Hospice was initiated because Dr. Jordan was terminally ill and could die any day.

73.     According to the hospice intake record of April 27, 2024, Dr. Jordan was "undecided [about CPR] but reports he's ready to get this illness over with."

74.     Hospice records also indicate that Dr. Jordan was a Widow and lived with his granddaughter, neither of which is accurate.

75.     Hospice records from April 27, 2024 also indicate that Dr. Jordan's cognition was intact and that he had an intractable cough/shortness of breath at rest.

76.     Hospice records from April 28, 2024 indicate that Dr. Jordan was "mainly bedbound" and "ambulates to the bathroom only."

77.     Hospice records indicate that Dr. Jordan was prescribed a number of medications between April 27-29, 2024.  That list included Haloperidol Lactate, Lorazepam, Dronabinol, Morphine, and Tramadol.  It is unclear from the hospice records if/when these various medications were administered to Dr. Jordan.

78.     Hospice records from May 3, 2024 indicate that Dr. Jordan had received his last round of Welireg 40 mg, which was his last round of treatment.  The same records indicate that Welireg was not covered by hospice, but was covered by Dr. Jordan's insurance.

### Greed Gets the Best of Abderrahman on April 29, 2024

79.    The house, the startup money, and the prior changes made to Dr. Jordan's estate plan to benefit Abderrahman were not enough for her.  That last known round of changes to Abderrahman's benefit occurred only ~ 150 days before April 29, 2024.

80.    In Abderrahman's view, more changes were necessary even though her benefactor was near death and on hospice.

81.    On April 28, 2024, Noel informed Dr. Jordan and Abderrahman that she was coming to Houston for a visit six days later.  Abderrahman took action the next day.

82.    Three different insurance/benefit documents were executed on April 29, 2024.  Candace Ganjavi did not know it before she arrived at the house on April 29, 2024, but she would be serving as the witness to the execution of these documents.

83.    None of the insurance/benefit documents executed on April 29, 2024 were the product of Dr. Jordan's free agency.

84.    Dr. Jordan's free agency was destroyed and each of the three documents executed on April 29, 2024 expressed Abderrahman's will rather than Dr. Jordan's true wishes.

85.    Abderrahman overcame Dr. Jordan's free agency by April 29, 2024, subtly and through an extended course of dealings and circumstances.

86.    One document executed on April 29, 2024, was titled "The University of Texas M.D. Anderson Cancer Center PRS Retirement Plan Designation of Beneficiary Form" or "RPBF."  The RPBF was filled out by Abderrahman.  She falsely listed her

"relationship" to Dr. Jordan as "Family."  The RPBF includes a "cut and paste" electronic signature for Dr. Jordan.  And the RPBF designates Abderrahman as the sole beneficiary.

87.    A second document executed on April 29, 2024, was titled "Beneficiary Designation Form" or "BDF" and was the subject of the Interpleader action brought by Dearborn.  The BDF was filled out by Abderrahman.  She falsely listed her relationship to Dr. Jordan as "Family."  Abderrahman included her own phone number, instead of Dr. Jordan's, in the space asking for his phone number.  Unlike the "cut and paste" signature for Dr. Jordan used that same day, Abderrahman alleges that Dr. Jordan hand-signed the BDF with Candace Ganjavi as a witness.

88.    Noel and Turner were the prior beneficiaries (50/50) of this life insurance policy and had been since October 2, 2014.  The amount of $424,000 in life insurance benefits should properly inure to Noel and Turner's benefit, not Abderrahman's, and said amount is currently being held by this Court.

89.    On July 1, 2024, an email from Kristen Johnson of BCBS to Krista Beasley of BCBS states:  "Hi Krista, I am sending this over to you as you had completed the ADB out there (E202404047).  The account manager wants to be sure we pay close attention to this as the group believes there is fraud with the designation and wanted intake to be aware when it came over.  I will review this with Brenda, but I wanted the full claim."

90.    The subject of the July 1, 2024 BCBS email was the BDF dated April 29, 2024 while Dr. Jordan was on hospice.

91.     A third document executed on April 29, 2024, was the Accelerated Death Benefit application or "ADB."  It includes Abderrahman's phone number, not Dr. Jordan's, for his contact information.  And it includes both Dr. Jordan's and Abderrahman's email addressed noting Abderrahman as "power of attorney/caregiver." The ADB application includes two "cut and paste" electronic signatures for Dr. Jordan.

92.     The ADB application bears the same date as the RPBF and BDF.  But Abderrahman stated in the "Authorization for Release of Information" section of the ADB application that she signed *for* Dr. Jordan as his "power of attorney/caregiver."  By so signing, Abderrahman attested that Dr. Jordan was "a minor, legally incompetent, or deceased."  Yet, Abderrahman maintains that Dr, Jordan was able to sign the RPBF and BDF himself.

93.     An accelerated death benefit is also known as a "living needs benefit" or "terminal illness benefit."

94.     Dr. Jordan was dead when his benefit was negotiated by Abderrahman.

95.     Dr. Jordan did not need the ADB because he had at least $2,500,000 available to him through at least three retirement accounts.  Abderrahman portrayed his financial situation in 2024 to be dire when she knew that was far from the truth.

96.     The ADB instructions pages includes:  "Your Life Insurance policy allows you to apply for an accelerated benefit paid to you during your lifetime if you are determined to have a terminal illness."

97.     The ADB instructions continue:

To be eligible for this Benefit, you must meet the following conditions:

- Be insured for Life Insurance under the Group Policy at the time you apply and receive this benefit.

- Provide us with satisfactory written proof from a medical professional that you have a terminal illness.

98.    To date, the only person who received Dr. Jordan's benefit is Abderrahman.

99.    The only proper receptacle for Dr. Jordan's $424,000 ADB was a return to the Dearborn/Blue Cross Blue Shield Life Insurance policy that was the subject of the interpleader action.

100.    Instead, Abderrahman opened Dr. Jordan's mail addressed as follows:



701 E. 22nd Street, Suite 300 – Lombard, IL 60148

VIRGIL C JORDAN
2817 NEWMAN ST
HOUSTON, TX 77098

June 6, 2024

RE:
    Insured:
    Group: THE UNIVERSITY OF TEXAS SYSTEM
    Group No: GFZ71778:506
    Claim No: E202404047
    Company: Blue Cross and Blue Shield of Texas

Dear V Jordan:

101.    Then, on June 11, 2024, Abderrahman deposited via ATM the $424,000 unendorsed check payable to Virgil Jordan into a joint account she shared with Dr. Jordan.  The same day Abderrahman reported this to Scruggs:

Tue, Jun 11 at 5:55 PM

> Hi Kathy,
> If I may call you tomorrow. I had a long day today and still caught up in things for Craig. Appreciate you reaching out 🙏

102.    Abderrahman misidentified herself as "Granddaughter" on Dr. Jordan's Death Certificate.

103.    Abderrahman requested 13 expedited copies of Dr. Jordan's Death Certificate and used that document to pursue benefits that were not lawfully hers.  The following are snips from documents provided by Service Corporation International in response to Noel/Turner's subpoena seeking records from Dr. Jordan's funeral home:

**Loved One Released To:**

Balkees Abderrhan
_____
Printed Name of Designated Representative

X _____
Signature of Designated Representative

2817 Newman Street
_____
Street Address

Houston          TX          77098
_____
City, State/Province and ZIP/Postal Code

281-435-0303
_____
Phone Number

Grand Daughter
_____
Relationship to the Loved One

7/2/2024
_____
Date

DL
_____
Type of Photo Identification Supplied

**Loved One Released By:**

Teresa M. Schnur
_____
Printed Name of Funeral Home Representative

_____
Signature of Funeral Home Representative

FIN-CS008 (Compliance Services 10/01/2023)                                    © 2023 SCI Shared Resources, LLC

---

## Receipt of Certified Copies of Death Certificate

I certify that on ___6/26/2024___ I received from Geo. H. Lewis & Sons

___13___ copies of the Certificate of Death for ___JORDAN, Virgil Craig___

Together with the following items (if any) _____

I further certify that I am the person authorized to receive said copies and agree to indemnify and hold harmless Geo. H. Lewis & Sons Funeral Directors, and its agents, for any misrepresentations of these facts.

_____        BALKEES ABDERRAHMAN        Send via Email
Received by (Signature)                              Received by (Print)                              Identification (Required)

_____        Daniela K. Parker
Released by (Signature)                              Released by (Print)

**Receipt**

| Receipt | |
|---|---|
| Funeral Home License: | 584 |
| Death Record Registration Number: | 000044445920791 |
| Number of Copies: | 13 |
| Funeral Home Address Used | |
| Shipping Method: | Expedited Delivery |
| Shipping Cost: | $16.00 |
| Subtotal: | $56.00 |
| Grand Total: | $72.00 |
| Trace Number: | 537DR92689546 |
| Remittance Number: | G675464 |

| 17. INFORMANT'S NAME & RELATIONSHIP TO DECEASED | 18. MAILING ADDRESS OF INFORMANT (Street and Number,City,State,Zip Code) | | |
|---|---|---|---|
| BALKEES ABDERRAHMAN - GRANDDAUGHTER | 2817 NEWMAN ST, HOUSTON, TX 77098 | | |
| 19. METHOD OF DISPOSITION<br>☐ Burial  ☒ Cremation  ☐ Donation<br>☐ Entombment ☐ Removal from state ☐ Mausoleum<br>☐ Other (Specify) | 20. SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH<br><br>TERESA SCHNUR .BY ELECTRONIC SIGNATURE - 118892 | 21.<br>Section<br>Block<br>Lot<br>Space | ☒ Unknown |
| 22. PLACE OF DISPOSITION (Name of cemetery, crematory, other place)<br>GULF COAST CREMATORY | 23. LOCATION (City/Town, and State)<br>HOUSTON, TX | | |
| 24. NAME OF FUNERAL FACILITY<br>GEO. H. LEWIS & SONS | 25. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code)<br>1010 BERING DRIVE, HOUSTON, TX 77057 | | |

EDR No:  000044445920791

Informant's signature: _____    Date: _____

| WARNING: THE PENALTY FOR KNOWINGLY MAKING A FALSE STATEMENT IN THIS FORM CAN BE 2-10 YEARS IN PRISON AND A FINE OF UP TO $10,000. (HEALTH AND SAFETY CODE, CHAPTER 195, SEC. 195.003) |
|---|

## CLAIMS FOR RELIEF

### COUNT ONE
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RIGHTS

104.    Noel and Turner restate all of the averments in the preceding paragraphs as if fully stated herein.

105.    Noel and Turner were third-party beneficiaries to Dr. Jordan's Dearborn/Blue Cross Blue Shield life insurance policy, the subject of Dearborn's Complaint in Interpleader, amounting to $424,000.00 at the time of his death.

106.    The Dearborn/Blue Cross Blue Shield life insurance policy was an existing contract subject to interference when the tortious acts occurred.

107.    By the tortious conduct described above, Abderrahman interfered with Noel and Turner's contractual rights as third-party beneficiaries.

108.    Abderrahman willfully and intentionally interfered with Noel and Turner's contractual rights.

109.    Abderrahman's tortious interference caused injury to Noel and Turner.

110.    Abderrahman's tortious interference caused Noel and Turner to suffer actual damages amounting to $424,000.00.

111.    In addition to actual and compensatory damages, Noel and Turner are entitled to recover exemplary damages from Abderrahman in an amount to be determined by a jury.

112.    As to Count One, Noel and Turner demand a jury trial.

## COUNT TWO
## UNDUE INFLUENCE

113.    Noel and Turner restate all of the averments in the preceding paragraphs as if fully stated herein.

114.    Dr. Jordan's Dearborn/Blue Cross Blue Shield life insurance policy, the subject of Dearborn's Complaint in Interpleader, amounted to $424,000.00 at the time of his death.

115.    But for Abderrahman's undue influence on Dr. Jordan, Noel and Turner would have remained the beneficiaries of Dr. Jordan's Dearborn/Blue Cross Blue Shield life insurance policy.

116.    Abderrahman had the opportunity to, and did, exert influence on Dr. Jordan up to and on April 29, 2024.

117.    Abderrahman's influence on Dr. Jordan operated to subvert or overpower Dr. Jordan's mind when the BDF was executed on April 29, 2024.

118.    Dr. Jordan would not have executed the BDF on April 29, 2024 but for Abderrahman's influence.

119.    Abderrahman's undue influence caused Noel and Turner to suffer actual and compensatory damages amounting to $424,000.00.

120.    As to Count Two, Noel and Turner demand a jury trial.

<u>**COUNT THREE:**</u>
<u>**MONEY HAD AND RECEIVED**</u>

121.    Plaintiffs reallege the allegations in the above paragraphs as if fully stated herein.

122.    The only proper receptable for the $424,000 check payable to Virgil Jordan for his accelerated death benefit was the Dearborn/Blue Cross Blue Shield life insurance policy.

123.    This is so because Dr. Jordan was dead before his $424,000 check was negotiated by Abderrahman.

33

124. Noel and Turner are the proper beneficiaries of the Dearborn/Blue Cross Blue Shield life insurance policy.

125. Abderrahman holds the $424,000 ADB, which in equity and good conscience, belongs to Noel and Turner.

126. The $424,000 paid out in the form of an accelerated death benefit must be paid to Noel and Turner by Abderrahman in order to prevent Abderrahman from being unjustly enriched.

127. As to Count Three, Noel and Turner demand a jury trial on all issues of fact.

## DEMAND FOR RELIEF

128. As to Count One, a money judgment against Abderrahman for actual and compensatory damages, exemplary damages, costs and reasonable attorneys' fees, along with prejudgment and post-judgment interest. Noel and Turner further demand that the $424,000.00 placed in the Court's registry by Dearborn/BCBS be awarded to them in equal amounts.

129. As to Count Two, a money judgment against Abderrahman for actual and compensatory damages, costs and reasonable attorneys' fees, along with prejudgment and post-judgment interest. Noel and Turner further demand that the $424,000.00 placed into the Court's registry by Dearborn/BCBS be awarded to them in equal amounts.

130.    As to Count Three, a money judgment against Abderrahman for actual and compensatory damages in the amount of $424,000, costs and reasonable attorneys' fees, along with prejudgment and post-judgment interest.

131.    For declaratory relief in accordance with 28 U.S.C. §§ 2201-2202 clarifying the legal rights, relations, and obligations of the parties as to Dr. Jordan's life insurance policy issued by Dearborn/BCBS.  And a declaration that all remaining benefits under that policy should be paid to Noel and Turner in equal amounts.

132.    For such other relief as the Court deems just, equitable, and supported by law.

Date:  July 8, 2025              By: */s/ Andrew J. Noel*
                                     Andrew J. Noel
                                     MN ID:  0322118
                                     anoel@robinskaplan.com
                                     Robins Kaplan LLP
                                     800 LaSalle Ave, Suite 2800
                                     Minneapolis, MN 55402
                                     Tel: 612-349-8500

                                     Marc Waters
                                     Ford + Bergner LLP
                                     221 West 6th St., Suite 900
                                     Austin, TX 78701
                                     Tel: 512-610-1100

                                     **Attorneys for Alexandra K.L. Noel
                                     and Helen M.Y. Turner**